**Dirk LAUREYSSENS, an individual; I Love Love Company, N.V., Creative City Limited, and Extar Corporation, Plaintiffs–Appellees, Cross–Appellants,**

**v.**

**IDEA GROUP, INC., Defendant–Appellant–Cross–Appellee,**

**Days Off Designs, Inc., Defendant.**

**Nos. 686, 846, Dockets 91–7869, 91–7917.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1992.

Decided May 15, 1992.

As Amended June 24, 1992.

Marya Lenn Yee, New York City (Morton Amster, Steven M. Levy, James Tramontana, Amster, Rothstein & Ebenstein, of counsel), for defendant-appellant-cross-appellee.

Paul Fields, New York City (Alexandra D. Malatestinic, Robert S. Weisbein, Darby & Darby, P.C., of counsel), for plaintiffs-appellees-cross-appellants.

Before: OAKES, Chief Judge, MESKILL and PRATT, Circuit Judges.

OAKES, Chief Judge:

At issue in this trade dress and copyright infringement case are the similarities between two sets of foam rubber puzzles. The puzzles produced by the parties contain six pieces with a variety of notches cut into each of their four edges. By interlocking the notched edges, the puzzles can be assembled either in a flat form in a rectangular frame or into a three-dimensional hollow cube. The more intrepid puzzler can piece together more challenging multi-puzzle combinations such as a larger cube or other three-dimensional figures including a beam of two or three cubes joined in a line, a cross of five cubes, and a star comprised of pieces from six cube puzzles.

One set of puzzles is marketed under the name HAPPY CUBE. The HAPPY CUBE puzzles were designed by Dirk Laureys-

sens and are produced, distributed, exported from Europe, and marketed in the United States through a number of entities including I Love Love Company, N.V., Creative City Limited, and Extar Corporation (collectively "Laureyssens"). The competing set is marketed under the name SNAFOOZ by Idea Group, Inc., a California corporation ("Idea Group").

Idea Group appeals from an order entered pursuant to a July 31, 1991 opinion of the United States District Court for the Southern District of New York, Robert M. Sweet, *Judge,* granting a preliminary injunction for trade dress infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), and under the New York common law of unfair competition. 768 F.Supp. 1036 (S.D.N.Y.1991). Pursuant to that order, Idea Group is enjoined from marketing SNAFOOZ puzzles "in flat form and in transparent packaging, unless the puzzle package contains an assembled SNAFOOZ puzzle." In addition, Laureyssens cross-appeals from the district court's denial of a preliminary injunction against Idea Group for copyright infringement, 17 U.S.C. §§ 101–914 (1988), which, if granted, would have forced Idea Group to cease all activities relating to the SNAFOOZ puzzles.

For the reasons set forth below, we reverse the district court's decision to grant a preliminary injunction based on trade dress infringement under section 43(a) of the Lanham Act and under the New York common law of unfair competition, and affirm the district court's decision to deny a preliminary injunction based on copyright infringement.

## I.

Dirk Laureyssens, a designer of various toys and puzzles, first began creating cube puzzles in 1985. Over the next few years, he refined his cube puzzle designs by selecting puzzle pieces which would not only permit assembly in flat and cube form, but which also were aesthetically pleasing. Six puzzle designs emerged, each of which contains pieces with edges that are five notch-widths to a side.[1]

By 1991, Laureyssens had filed certificates of copyright registration with the Copyright Office in Washington for each of his six designs. The certificates indicate that the nature of authorship claimed consists of the shape of the pieces; the certificates also refer to earlier filings with the Copyright Office in 1987 and 1988 which also covered his puzzle designs.

Laureyssens introduced his puzzles for sale in the United States at the 1988 International Toy Fair held in New York City. Subsequently, he decided to market them on his own under the name CUBE–IT. After his counsel discovered a trademark conflict, prior to the 1990 International Toy Fair in New York, Laureyssens changed the name of the puzzles to HAPPY CUBE.

HAPPY CUBE puzzles come in six colors and each is named after a well-known city. The yellow puzzle is named Tokio [sic], the green New York, the purple Brussels, the orange Amsterdam, the blue Milano, and the red Paris. By design, some of the puzzles are harder to assmeble than others.

HAPPY CUBE puzzles are packaged for sale in the flat assembled form in clear plastic shrink-wrap with a cardboard insert. The HAPPY CUBE name is printed on the upper right hand portion of the cardboard insert against a black background. Each letter of the word HAPPY is colored in one of the puzzle colors. The word "CUBE" is colored blue, the color of the sixth puzzle variation. Underneath the logo is a color and model chart identifying all six puzzles by color and city name. Beneath the chart is a color photograph of two hands assembling a double-sized cube involving pieces from all six puzzles. The reverse side of the insert, which can only be read after removing the insert from the packaging, depicts the different "missions" for the puzzler. These range from assembling a one-color cube to assembling the HAPPY CUBE star, involving thirty of the thirty-six pieces from the six different puzzles.

Since their introduction in the United States market, Laureyssens claims to have

---

**1.** A notch-width is equal to the thickness of the puzzle material. The notch-width must be equal to the thickness of the puzzle material in order to join two pieces smoothly in the perpendicular alignment.

sold 103,000 puzzles, 90,000 of which were marketed in the HAPPY CUBE packaging. Raphael Berkien, the chief executive officer of Laureyssens' exclusive United States distributor Extar Corporation, declared in an affidavit that sales since 1988 were worth $50,000, but one week later was unable to substantiate the figure during his deposition. Berkien also claims to have orders for an additional 250,000 puzzles, and to have entered into an agreement with an organization possessing a nationwide sales force of 40 sales representatives, each of whom apparently committed to selling 100,000 puzzles per month.

Following the original appearance at the 1988 American International Toy Fair in New York, Laureyssens exhibited the puzzles at toy and novelty shows across the country where leaflets in the style of the packaging were distributed. Laureyssens also advertised the puzzles in various trade publications, such as the New York Toy Fair Directory.

Television advertising has been limited. The Laureyssens puzzles were featured during an episode of "Family Feud" in which two wrestling teams that were competing on the show played with the cubes. In addition, Maui Productions produced an installment of its half-hour promotional show "Incredible Breakthroughs" about the puzzles, featuring representatives from the National Football League and professional football players, which was scheduled to air for four months beginning on July 4, 1991.

Dirk Laureyssens testified that he has spent approximately $80,000 in connection with these advertising and promotional efforts, a figure which includes his salary. Berkien stated that, by his estimation, approximately $180,000 had been expended to advertise and promote the puzzles over the last three years, but later conceded during his deposition that these expenditures covered the entire line of HAPPY toy products.

The Laureyssens puzzles received some unsolicited media coverage when NBC News broadcast a segment on the puzzles which was filmed at the Dallas Toy Fair in 1990.[2]

Laureyssens is also attempting to sell his puzzles in the novelty and premium item market. For example, in March 1991, Extar obtained a license from the National Football League allowing Laureyssens to place various NFL trademarks on the puzzles. Also, Extar entered into an agreement with Strottman International, Inc., a supplier of premium and novelty products to packagers such as fast food chains and breakfast cereal companies, which granted Strottman exclusive promotional rights to the Laureyssens puzzles in the premium industry.

The first conflict between Laureyssens and Idea Group arose at the 1990 American International Toy Fair in New York City. During the fair, Dirk Laureyssens discovered that Idea Group was manufacturing and marketing identical puzzles called SNAFOOZ. After receiving cease and desist letters from Laureyssens' counsel, Idea Group acknowledged on March 19, 1990 that "our puzzle apparently was copied from a sample obtained through your French distributor or licensee and, in its present form, cannot be marketed in the U.S. without your permission."

The president of Idea Group was approached by Mr. Berkien of Extar Corporation approximately one month after the Toy Fair about the possibility of Idea Group marketing the Laureyssens puzzles in the United States. Apparently, Berkien was unaware of the recent dispute between Dirk Laureyssens and Idea Group until a few hours before he was supposed to meet with Idea Group. After a few weeks of negotiations, however, the parties failed to reach an agreement.

Following the breakdown of negotiations with Laureyssens, Idea Group decided to develop its own version of the flat-to-cube puzzle series, utilizing pieces whose edges were six notch-widths in length rather than five. Late in July 1990, an executive vice president of Idea Group contacted a graduate student in computer science at the Massachusetts Institute of Technology, Eric Brewer, and described the new series of puzzle designs that Idea Group was hop-

2. The nature of the coverage was not detailed in the record.

ing to market. Brewer then met with the executive vice president who provided him with two of the old SNAFOOZ Puzzles and discussed the nature of the computer program Idea Group desired. An agreement was reached in August 1990, and the graduate student completed the work for Idea Group a few weeks later. Brewer stated in an affidavit that he designed the new series entirely from scratch, utilizing the old SNAFOOZ Puzzles only to gain an understanding of the desired product and to calibrate the difficulty of his puzzle designs against the five notch-width designs of the Laureyssens puzzles.

After receiving the designs from Brewer, Idea Group made arrangements to manufacture the new SNAFOOZ puzzles. From September 1990 to February 1991, Idea Group received approximately 300,000 SNAFOOZ puzzles from its manufacturer in Korea. In preparation for the maiden exhibition of the new six-notch width SNAFOOZ puzzles at the 1991 American International Toy Fair in New York City, Idea Group conducted a direct mail campaign to potential customers, and placed advertisements in the 1991 Toy Fair Directory and other trade publications.

The packaging for Idea Group's SNAFOOZ puzzles consists of several different styles, all of which were originally designed between June 1989 and February 1990, for the exhibition of the old SNAFOOZ puzzles at the 1990 American International Toy Fair. The simplest packaging consists of one puzzle assembled in flat form, wrapped in shrink wrap, and a cardboard wraparound insert. The cardboard insert features the word SNAFOOZ across the top in large, wind-swept, rainbow-colored lettering against a black background. Each letter is colored in at least two different rainbow hues. Beneath the SNAFOOZ logo is a black and white depiction of an assembled cube which protrudes into a cutout window revealing the puzzle itself. The back of the insert, which can be seen by turning over the package, displays the various combinations the puzzler can attempt. Idea Group also markets SNAFOOZ puzzles in blister packs of one, three, and six puzzles. The blister packs feature the same SNAFOOZ logo printed on black cardboard backing. Inside the molded plastic blister, Idea Group includes one puzzle in the assembled cube form.

SNAFOOZ puzzles are offered in the same six colors as the Laureyssens puzzles. Although Idea Group attempted to branch out by manufacturing the puzzles in "hot" neon colors, these puzzles did not meet child-safety toxicity specifications.

During the 1991 American International Toy Fair in February, Laureyssens paid a visit to Idea Group's showroom but made no effort to stop Idea Group from selling the SNAFOOZ puzzles at the fair. At the end of the fair, Laureyssens met with representatives from Idea Group in his counsel's office, but made no demand on Idea Group to cease and desist from infringing on his copyrights or the HAPPY CUBE trade dress.

In April 1991, Laureyssens instituted this action against Idea Group seeking, *inter alia,* to enjoin Idea Group from infringing Laureyssens' copyrights and trade dress by distributing the SNAFOOZ puzzles. On June 5, 1991, Laureyssens moved for a preliminary injunction to prevent Idea Group from engaging in any further activity with respect to the marketing and sale of SNAFOOZ puzzles. Testimony was heard on the motion on July 1 and 2, and the matter was argued and fully submitted on July 10, 1991.

On July 31, 1991, the district court issued an opinion, 768 F.Supp. 1036, denying Laureyssens' motion for a preliminary injunction based on copyright infringement, but granting Laureyssens' motion on the grounds that Idea Group's flat-form, shrink wrapped SNAFOOZ packaging raises a serious question of trade dress infringement under section 43(a) of the Lanham Act and under the New York common law of unfair competition. A corresponding order issued on August 7, 1991 preliminarily enjoined Idea Group from "marketing its SNAFOOZ puzzles ... in flat form and in transparent packaging, unless the puzzle package contains an assembled SNAFOOZ puzzle."

This appeal and cross-appeal followed.

## II.

A party seeking a preliminary injunction must establish (1) irreparable injury and (2)

a likelihood of success on the merits *or a sufficiently serious question* going to the merits and a balance of hardships tipping decidedly in the moving party's favor. *Stormy Clime Ltd. v. Progroup, Inc.,* 809 F.2d 971, 973–74 (2d Cir.1987); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). We review the district court's decision to grant a preliminary injunction for an abuse of discretion. *See Stormy Clime Ltd.,* 809 F.2d at 974 (involving claim of trade dress infringement); *Ideal Toy Corp. v. Fab–Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir.1966) (involving claim of copyright infringement). We examine first the merits of Laureyssens' claims.

### A. *Trade Dress Infringement under section 43(a) of the Lanham Act*

■ To prevail on a claim of trade dress infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), a plaintiff must demonstrate that the product's appearance has acquired secondary meaning and that purchasers are likely to confuse the imitating goods with the originals. *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 168 (2d Cir.1991).[3] The defendant may avoid liability, however, by proving that the trade dress is not worthy of protection under the trademark law because it is functional. *Id.; see also Restatement (Third) of Unfair Competition* §§ 16, 17 comment a at 122 (Tent. Draft No. 2, 1990) (*Restatement*).

"[P]roof of secondary meaning entails vigorous evidentiary requirements."

*Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir.1985) (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 134 (S.D.N.Y.1972)). In determining whether a trade dress has acquired secondary meaning we look to factors such as consumer studies establishing consumer recognition, length and exclusivity of trade dress use, sales success, advertising expenditures, and unsolicited media coverage. *See Id.; see also Restatement, supra,* § 16 comment b at 106. In addition, "[e]vidence that the trade dress or product design was intentionally copied by a competitor can support an inference of secondary meaning if the circumstances indicate an intent to benefit from the good will of the prior user through confusion." *Restatement, supra,* § 16 comment b at 106; *see also Coach Leatherware,* 933 F.2d at 169.

The district court found that there was no serious question whether *actual* secondary meaning exists in the HAPPY CUBE trade dress. We think this conclusion is sound given the weak sales of the HAPPY CUBE puzzles, low expenditures for advertising and promotion, minimal unsolicited media coverage, and the brief period of exclusive use of the HAPPY CUBE trade dress.[4] And, while there was evidence of intentional imitation as to the puzzles themselves, there was no evidence of copying of the trade dress.

The district court concluded, however, that Laureyssens satisfied the requirement of secondary meaning by raising a serious question whether the flat-form, shrink-

---

**3.** We need not decide today whether the HAPPY CUBE trade dress should be protected in the absence of secondary meaning because it is inherently distinctive. The Fifth, Seventh, and Eleventh Circuits do not require proof of secondary meaning if a trade dress is distinctive. *See Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1182 (7th Cir.1989); *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 426 (5th Cir.1984); *Ambrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir.1986), *cert denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); *see also Restatement (Third) of Unfair Competition* § 16 comment b at 105 (recognizing protection for an inherently distinctive trade dress); *cf. Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 952–53 (2d Cir.1980) (discussing

why New York law does not require proof of secondary meaning in unfair competition claims involving trade dress infringement). The issue is now before the Supreme Court in *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1119–21 (5th Cir.1991), *cert. granted,* — U.S. —, 112 S.Ct. 964, 117 L.Ed.2d 130 (1992). The Laureyssens trade dress at issue here, consisting of a shrink-wrapped puzzle containing a black cardboard insert with a rainbow-colored HAPPY CUBE logo, is not in our view inherently distinctive.

**4.** The record indicates that the HAPPY CUBE trade dress was adopted in 1990, and for some of that time Idea Group was marketing its puzzles in the allegedly infringing trade dress.

wrapped HAPPY CUBE trade dress should be protected under the doctrine of secondary meaning *in the making*.

◼ In *Metro Kane Imports, Ltd. v. Federated Dept. Stores, Inc.*, 625 F.Supp. 313, 316 (S.D.N.Y.1985), *aff'd*, 800 F.2d 1128 (2d Cir.1986), Judge Sweet explained that a trade dress will be "protected against intentional, deliberate attempts to capitalize on a distinctive product" where "secondary meaning is 'in the making' but not yet fully developed." *See also Jolly Good Industries, Inc. v. Elegra, Inc.*, 690 F.Supp. 227, 230–31 (S.D.N.Y.1988) (indicating that the theory has been "well-received by commentators" and citing as an example, 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 77.3, at 356 (3d ed.1971)).[5] The supposed doctrine seeks to prevent pirates from intentionally siphoning off another's nascent consumer recognition and goodwill. *See, e.g., Jolly Good*, 690 F.Supp. at 230–31.

In this case, Judge Sweet found that although Idea Group offered evidence that the SNAFOOZ packaging was developed without prior knowledge of the HAPPY CUBE trade dress, "the evidence does not indicate when [Idea Group] developed its flat-form shrink wrapped package, and therefore Plaintiffs have barely established a serious question of [Idea Group's] 'intentional deliberate attempts' to copy their trade dress." 768 F.Supp. at 1048.

◼ We are, then, squarely presented for the first time with the question whether the doctrine of secondary meaning in the making should be recognized under the Lanham Act.[6]

We begin our analysis with an examination of the text of section 43(a), 15 U.S.C. § 1125(a) (1988), which provides:

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device or any combination thereof, or any false designation of origin ... which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the ... *origin, sponsorship, or approval of his or her goods ...*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. (Emphasis added)

Two aspects of this statutory language lead us to believe that the theory of secondary meaning in the making should not be recognized under section 43(a). First, the statute prohibits only the use of any "word, term, name, symbol, or device, or any combination thereof" or "false designation of origin" which is likely to cause confusion, mistake, or deception as to the "origin, sponsorship, or approval" of goods. Where there is no actual secondary meaning in a trade dress, the purchasing public simply does not associate the trade dress with a particular producer.[7] Therefore, a subsequent producer who adopts an imitating trade dress will not cause confusion, mistake, or deception as to the "origin, sponsorship, or approval" of the goods. Second, a junior producer's use of imitating trade dress bears no "false designation of origin" because, in the absence of secondary meaning in the senior producer's trade dress, the imitating trade dress suggests no particular origin to the consuming public. *See Cicena Ltd. v. Columbia Telecommunications Group*, 900 F.2d 1546, 1548–50 (Fed.Cir.1990) (analyzing the text of section 43(a) of the Lanham Act in a trade dress infringement case before its amendment by the Trademark Law Revision Act of 1988, Pub.L. No. 100–667, 1988

---

**5.** The subsequent edition of Callman's treatise, however, contains no language expressing approval for the doctrine of secondary meaning in the making. See 3 R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 19.27 (4th Ed.1989).

**6.** In *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581 (2d Cir.1991), we declined to adopt the doctrine despite appellant's urging. However, our mention of the doctrine in Lang was not essential to our holding of no likelihood

of confusion under the Polaroid test. See *Thompson Medical*, 753 F.2d at 214 ("No single Polaroid factor is preeminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit.").

**7.** But see *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119–21 & n. 8 (5th Cir. 1991), cert. granted, —— U.S. ——, 112 S.Ct. 964, 117 L.Ed.2d 130 (1992).

U.S.C.C.A.N. (102 Stat.) 3935, 3946 (codified at 15 U.S.C. § 1125(a) (1988))).

Moreover, "[t]he doctrine, if taken literally, is inimical to the purpose of the secondary meaning requirement." *Restatement, supra,* § 13 reporter's note, comment e at 53. The secondary meaning requirement exists to insure that something worth protecting exists—an association that has developed in the purchasing public's mind between a distinctive trade dress and its producer—before trademark law applies to limit the freedom of a competitor to compete by copying. As the drafters of the *Restatement, supra,* § 17 comment b at 104–05, explain:

> The freedom to copy product and packaging features is limited by the law of trademarks only when the copying is likely to confuse prospective purchasers as to the source or sponsorship of the goods. The imitation or even complete duplication of another's product or packaging creates no risk of confusion unless some aspect of the duplicated appearance is identified with a particular source. Unless a design is distinctive ... and thus distinguishes the goods of one producer from those of others, it is ineligible for protection as a trademark.

*See also Norwich Pharmacal Co. v. Sterling Drug, Inc.,* 271 F.2d 569, 572 (2d Cir. 1959) ("Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a 'free ride' is permitted."), *cert. denied,* 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 952–53 (2d Cir.1980). The so-called doctrine of secondary meaning in the making, by affording protection before prospective purchasers are likely to associate the trade dress with a particular sponsor, constrains unnecessarily the freedom to copy and compete.

The Eighth Circuit previously recognized the improper focus of the concept of secondary meaning in the making in *Black & Decker Mfg. v. Ever–Ready Appliance Mfg.,* 684 F.2d 546, 550 (8th Cir.1982):

> Such a theory focuses solely upon the intent and actions of the seller of the product to the exclusion of the consum-

ing public; but the very essence of secondary meaning is the association in the mind of the public of particular aspects of trade dress with a particular product and producer.

*See also* Scagnelli, *Dawn of a New Doctrine?—Trademark Protection for Incipient Secondary Meaning,* 71 Trademark Rep. 527, 542–43 (1981).

The argument in favor of permitting development of a doctrine of secondary meaning in the making, offered by Laureyssens, rests principally on the supposition that, without such a doctrine, there will be strong incentives for pirates to capitalize on products that have not yet developed secondary meaning. This argument, however, underestimates the level of protection afforded under existing law to prevent piracy in the early stages of product development. *See* Scagnelli, *supra,* at 543–49. For example, intentional copying is "persuasive evidence" of secondary meaning. *Coach Leatherware,* 933 F.2d at 169 (noting, however, that "conscious replication alone does not establish secondary meaning"); *see also Restatement, supra,* § 17 comment b at 106. Furthermore, secondary meaning can develop quickly to preclude knock-off artists from infringing. *See Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 541 (2d Cir.1956) (secondary meaning acquired in mark MATERNALLY YOURS for maternity apparel store in the 11 months preceding defendant's opening of store named YOUR MATERNITY SHOP). Finally, under New York's common law of unfair competition, a producer's trade dress is protected without proof of secondary meaning against practices imbued with an odor of bad faith. *See Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). These practices include palming off, actual deception, appropriation of another's property, *see Norwich Pharmacal,* 271 F.2d at 570–71; *Upjohn Co. v. Schwartz,* 246 F.2d 254, 261–62 (2d Cir.1957), or deliberate copying. *See Morex S.P.A. v. Design Inst. of Am., Inc.,* 779 F.2d 799, 801–02 (2d Cir. 1985); *Perfect Fit Indus.,* 618 F.2d at 952–54; *Restatement, supra,* § 16 reporter's note at 115. Therefore, true innovators, at

least under New York law, have adequate means of recourse against free-riders.

For these reasons, we reject the doctrine of secondary meaning in the making under section 43(a) of the Lanham Act. Accordingly, we reverse the district court's decision to grant a preliminary injunction against Idea Group based on section 43(a) of the Lanham Act. Given our holding, we need not address the likelihood of confusion which may have been created by the SNAFOOZ trade dress.

### B. *New York Common Law of Unfair Competition*

█ As we have just explained, under the New York common law of unfair competition, a plaintiff need not establish secondary meaning in order to prevent a competitor from using a confusingly similar trade dress where the competitor is engaged in palming off, actual deception, appropriation of the plaintiff's property, or deliberate copying of a trade dress.

█ The district court noted that "[Idea Group] introduced evidence that it selected its trade dress before it knew of Laureyssens, which would suggest that the choice was not based on any improper motive." 768 F.Supp. at 1050. However, the district court granted the preliminary injunction on New York common law of unfair competition grounds because Idea Group did not establish exactly when its trade dress was adopted, thereby raising a serious question regarding Idea Group's good faith.

The hearing testimony and affidavit of Idea Group's president reveal that Idea Group's SNAFOOZ packaging was developed between June 1989 and February 1990, prior to the 1990 Toy Fair. The first design concepts were submitted sometime during those months to Idea Group by a New York graphic design firm which they hired, one of which was SNAFOOZ and the other, TEEZER. The SNAFOOZ design submitted at that time was virtually identical to the packaging presented by Idea Group at the 1990 Toy Fair. Although there is no evidence pinpointing exactly when Idea Group finalized the trade dress for the 1990 Toy Fair, we find nothing in the record which indicates that Idea Group

or the graphic design firm was aware of the HAPPY CUBE trade dress prior to creating or settling on a design, or that they intentionally copied the HAPPY CUBE trade dress.

Without evidence sufficient to raise a serious question of bad faith on the part of Idea Group, we reverse the district court's decision to grant a preliminary injunction against Idea Group based on New York's common law of unfair competition.

### C. *Copyright infringement*

█ In order to establish a claim for copyright infringement, a plaintiff must show ownership of a valid copyright and the defendant's infringement by unauthorized copying. *See Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.1992); *Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 763 (2d Cir.1991); *Weissmann v. Freeman,* 868 F.2d 1313, 1320 (2d Cir.), *cert. denied,* 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989). After conducting this analysis, the district court concluded that Laureyssens did not raise a serious question whether Idea Group's SNAFOOZ puzzles infringe his copyrights in the HAPPY CUBE puzzle designs.

In this cross-appeal by Laureyssens, the parties do not take issue with the district court's conclusion that Laureyssens owns valid copyrights in the HAPPY CUBE puzzle designs. Therefore, we will focus our review on Laureyssens' claim that the district court erred in its analysis of whether the SNAFOOZ puzzles raise a serious question of actionable copying.

It is now an axiom of copyright law that actionable copying can be inferred from the defendant's access to the copyrighted work and substantial similarity between the copyrighted work and the alleged infringement. *See Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). We have recently explained this recitation to mean that a plaintiff must first show that his work was actually copied by proving "access and substantial similarity between the works." *See Folio Impressions,* 937 F.2d at 765. The plaintiff then must show that the copying amounts

to an "improper" or "unlawful" appropriation, *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir.1946), by demonstrating that substantial similarities relate to protectible material. *See Folio Impressions,* 937 F.2d at 765; *see also* Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement,* 90 Colum.L.Rev. 1187, 1191–1204 (1990) (clarifying that copyright infringement claims involve consideration of similarity at two different stages of the analysis—actual copying and improper appropriation).

The presence of a "substantial similarity" requirement in both prongs of the analysis—actual copying and whether the copying constitutes an improper appropriation—creates the potential for unnecessary confusion, especially because a plaintiff need not prove *substantial* similarity in every case in order to prove actual copying. *Cf. Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 907 (3d Cir.) ("[S]ubstantial similarity to show that the original work has been copied is not the same as substantial similarity to prove infringement. As the *Arnstein* case points out, dissection and expert testimony in the former setting are proper but are irrelevant when the issue turns to unlawful appropriation. While '[r]ose is a rose is a rose is a rose,' substantial similarity is not always substantial similarity."), *cert. denied,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975). As Professor Latman explains:

Copying in the first instance may be established by direct or indirect proof. Though direct proof may not be routinely available, its potential should not be overlooked.

A common form of indirect proof of copying—but far from the only form—is a showing of defendant's opportunity to come into contact with plaintiff's work and such similarities between the works which, under all the circumstances, make independent creation unlikely. *Such similarities may or may not be substantial.* They are not, however, offered for their own sake in satisfaction of the requirement that defendant has taken a substantial amount of protected material from the plaintiff's work. Rather, they are offered as probative of the act of copying and may accordingly for the sake of clarity conveniently be called "probative similarity."

Latman, *supra,* at 1214 (emphasis added); *see also* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.03[A], at 13–23 (1991) ("Although the term 'substantial similarity' often is invoked as a proxy to prove copying as a factual proposition, we have seen that the term 'probative similarity' is to be preferred in that context and the question of 'substantial similarity' arises analytically only thereafter.").

■ For these reasons, we wish to restate some of our previous explanations of the requirements for proving actionable copying in copyright infringement cases. A plaintiff must first show that his or her work was actually copied. Copying may be established either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony. If actual copying is established, a plaintiff must then show that the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works.

■ In the case at hand, with respect to proof of actual copying, Idea Group does not dispute that it had access to the HAPPY CUBE puzzles.[8] Furthermore, after examining pieces of the HAPPY CUBE and SNAFOOZ puzzles, we find similarities in their shapes which are probative of copying and which at least raise a question of actual copying.[9] The central concern in this

---

**8.** Idea Group, in fact, gave two of their original SNAFOOZ puzzles, which admittedly were copies of the HAPPY CUBE puzzles, to the graduate student hired to design the new SNAFOOZ puzzles.

**9.** No expert testimony was included in the record pertaining to the ability of an individual to create a series of puzzles with six-notch widths per edge based on a visual inspection of puzzle pieces with five notch-widths per edge, which would help to resolve whether a question of actual copying has been shown. See *Arnstein,* 154 F.2d at 468.

appeal, then, is whether the district court properly determined that no serious question exists of unlawful appropriation of protected material.

■ The test for unlawful appropriation to prove infringement of another's copyright asks whether substantial similarity as to protectible material exists between the works at issue. *Folio Impressions*, 937 F.2d at 765. To that end, we determine in most cases whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960). However, where a design contains both protectible and unprotectible elements, we have held that the observer's inspection must be more "discerning," ignoring those aspects of a work that are unprotectible in making the comparison. *Folio Impressions*, 937 F.2d at 765–66.

The district court applied the more discerning ordinary observer test for substantial similarity of *Folio Impressions*, concluding that this was the appropriate test because only the shapes of the HAPPY CUBE puzzle pieces are protected by Laureyssens' copyrights. In doing so, the district court excluded from its consideration of substantial similarity the fact that both sets of designs involve "a hollow cube puzzle formed from six pieces with rectilinear interlocking projections which can also be assembled into a flat three-piece-by-two-piece form."

Laureyssens argues that it was clearly erroneous for the district court to exclude any portion of the Laureyssens design because Laureyssens created the puzzles independently, thereby rendering the entire puzzle design "original" under the standard of *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, —— U.S. ——, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991). We disagree. "[T]he protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 912 (2d Cir. 1980) (quoting *Reyher v. Children's Tele-*

*vision Workshop*, 533 F.2d 87, 90 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)); *see also Rogers*, 960 F.2d at 307. In the case at hand, in order to express the idea of a perfect hollow cube puzzle that can also be assembled in flat form, a designer must use pieces that interlock through fingers and notches cut at right angles. Indeed, Idea Group presented evidence of two different patents that were obtained for flat-to-cube puzzles in 1974 and 1975; both were created prior to Laureyssens' work. Therefore, we think the district court was correct in concluding that the Laureyssens copyright extends only to his particular expression of the idea of a flat-to-cube puzzle, manifested in the particular shapes of his puzzle pieces. *Cf. Mattel, Inc. v. Azrak–Hamway Intern., Inc.*, 724 F.2d 357, 360 (2d Cir.1983) (5½" "Warlord" action figure toy doll did not infringe Mattel's copyright in 5½" "Masters of the Universe" action figure toy doll because both are different expressions of the same unprotectible idea of a superhuman muscleman crouching in a fighting pose).

■ Finally, Laureyssens argues that the district court misapplied even the more discerning ordinary observer test for substantial similarity because Laureyssens contends that any differences between the shapes of the puzzle pieces reflect only a proportional enlargement of the puzzle pieces.

As Judge Learned Hand pointed out in *Peter Pan Fabrics*, "[N]o principle can be stated as to when an imitator has gone beyond copying the 'idea' and has borrowed its 'expression.'" 274 F.2d at 489. However, he explained that in deciding whether unlawful appropriation has taken place, "one should consider the uses for which the design is intended, especially the scrutiny that observers will give to it as used." *Id.*

Here, the designs of the puzzle pieces at issue have as their purpose the creation of a puzzle which can be assembled in either cube or flat form. The question, then, is whether the ordinary observer would consider a design change in the shapes of the pieces from five notch-widths per edge to

six notch-widths per edge as effectuating essentially the same puzzle challenge with pieces that have somewhat wider notches and fingers, or as effectuating a completely different expression of a flat-to-cube puzzle.

We think that an ordinary observer would conclude that the design change to six notch-widths per edge in the shapes of the SNAFOOZ puzzle pieces results in a qualitatively different challenge to the puzzler. A side-by-side visual comparison of the pieces comprising the green HAPPY CUBE and the purple SNAFOOZ—the two puzzles with the most pieces that are supposedly similar—provides the clearest evidence of the different ways in which the HAPPY CUBE and SNAFOOZ puzzles express the idea of a flat-to-cube: three of the six pieces in each puzzle share some similarities, none are virtually identical, and the remaining three are quite different. Based on this observation, we think the ordinary observer comparing the shapes of the pieces would conclude that SNAFOOZ is a bona fide redesign of the idea of a flat-to-cube puzzle. If the ordinary observer were asked to compare side-by-side two common cardboard 500–piece jigsaw puzzles depicting the American flag where the two puzzles were configured differently, and assuming that the copyright did not protect the particular depiction of the flag, we certainly think the observer would conclude that the allegedly infringing jigsaw puzzle was simply a different expression of the idea of a jigsaw puzzle.

Our belief that the SNAFOOZ puzzles are not unlawful appropriations of the HAPPY CUBE designs is reinforced by the testimony of the graduate student who designed the SNAFOOZ puzzles. He stated in his affidavit that he generated a computer program from scratch to create flat-to-cube puzzles that could also be assembled in multi-puzzle combinations with six notch-widths per edge. Declaration of Eric Brewer ("I can state without equivocation that I designed the SNAFOOZ Puzzles, along with their solutions and the solutions for all of the complex shapes ... without any reference to the Five–Segment Puzzles

(other than to play with them); I started from scratch.").

For these reasons, we conclude that the district court did not abuse its discretion in deciding that the SNAFOOZ puzzles pose no serious question of unlawful appropriation, and accordingly, of copyright infringement with respect to the protectible elements of Laureyssens' copyrights in his HAPPY CUBE designs.

III.

We have considered all of the arguments pertaining to the merits in this appeal and cross-appeal of the district court's decision to grant a preliminary injunction, and they offer no basis upon which to sustain the issuance of the preliminary injunction. Accordingly, the district court's decision to grant a preliminary injunction based on trade dress infringement under section 43(a) of the Lanham Act and under the New York common law of unfair competition is reversed, the district court's denial of a preliminary injunction based on copyright infringement is affirmed, and costs are awarded to Idea Group.

Preliminary injunction vacated.