CHERE AMIE, INC., Obvious, Inc. and Greena, Inc., Plaintiffs,

v.

WINDSTAR APPAREL, CORP., Global Apparel, Inc, Jong Ki Park, Jae C. Han, Paula B. Abraham, Barbara Rentzer, Mia Decaro and Young Hwa Yoo, Defendants.

No. 01 Civ. 0040.

United States District Court, S.D. New York.

March 2, 2001.

Bruce A. Claugus, Claugus & Mitchell, New York, New York, for Plaintiff.

Neil Flynn, DeMaggio & DeMaggio, New York, New York, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Plaintiffs Chere Amie, Inc., Obvious, Inc. and Greena, Inc. seek a preliminary injunction pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.,* and the Copyright Act, 17 U.S.C. §§ 101 *et seq.,* enjoining defendants Windstar Apparel, Corp., Global Apparel, Inc., Jong Ki Park, Jae C. Han, Paula B. Abraham, Barbara Rentzer, Mia Decaro and Young Hwa Yoo from producing and selling sleepwear apparel which plaintiffs claim infringes Obvious, Inc.'s trademark "Girl Zone" and five of its copyrighted sleepwear designs. For the reasons stated below, plaintiffs' application is granted.

## BACKGROUND

### Procedural History

Plaintiffs moved by order to show cause on January 3, 2001 for, *inter alia,* a temporary restraining order and a preliminary injunction enjoining defendants from selling or distributing infringing sleepwear. In addition to trademark and copyright infringement, plaintiffs' complaint asserts claims for misappropriation of trade secrets, conversion, tortious interference with business relationships, unfair competition, and RICO violations.

On January 8, after hearing counsel for all parties, this Court issued a temporary restraining order enjoining defendants from infringing plaintiffs' trademark, "Girl Zone," and copyrights in five pajama designs. (*See* Order to Show Cause at 8, No. 01 Civ. 0040(WHP), S.D.N.Y. Jan. 8, 2001.) At that time, this Court also established a

briefing schedule for the preliminary injunction motion, an expedited discovery schedule, and set January 22, 2001 for an evidentiary hearing.

At the January 22 hearing, plaintiffs called two witnesses: Dong Yung Gang ("Gang"), the former president of Obvious, Inc. ("Obvious"), and Chang W. Lee ("Chang Lee"), Obvious' current chief executive officer. Defendants called Jong Kee Park ("Park"), the president of Windstar Apparel, Inc. ("Windstar"). After presenting those witnesses, the parties stipulated that no additional testimony was necessary and plaintiffs limited their preliminary injunction application to their trademark and copyright claims. (Transcript from Evidentiary Hearing dated January 22, 2001 ("Tr.") at 88; Letter from Bruce Claugus, Esq., dated Jan. 26, 2001 at 1.)

*The Parties*

Chere Amie, Inc. ("Chere Amie"), a California close corporation founded by Naim Ho Paik ("Paik"), has manufactured children's and women's sleepwear since 1993. (Affidavit of Nam Ho Paik, dated Dec. 21, 2000 ("Paik Aff.") ¶ 2.) Obvious, a New York corporation, designs and markets clothing for Chere Amie. (Paik Aff. ¶ 3.) Greena, Inc., a closely-held Chere Amie affiliate established in 1997, distributes Chere Amie's products. (Paik Aff. ¶ 4.)

The parties dispute who controlled Obvious. At the hearing, while Gang was uncertain whether he was the sole shareholder of Obvious, he claimed to be the "sole proprietor" and president of Obvious until April 1, 2000. (Tr. at 35–36.) In contrast, Paik asserted that he was the sole shareholder of Obvious until September 1, 2000, when he transferred forty shares to Chang Lee and twenty shares to Kwan B. Lee. This was corroborated by Change Lee who

testified that he received forty shares of Obvious when he was appointed as president of Obvious. (Paik Reply Aff. ¶ 3.; Tr. at 68.) While Obvious' corporate records have disappeared, plaintiffs offered Obvious employees' paychecks bearing Paik's name, although not his signature, and Obvious' by-laws, dated January 26, 1996, which Paik signed as its "incorporator," as further circumstantial evidence of ownership. (Reply Aff. of Nam Ho Paik ("Paik Reply Aff.") Ex. A: Obvious' By–Laws; Ex B: Checks to Paula Abraham.) Based on the testimony of Gang and Chang Lee, this Court finds that Paik was a shareholder of Obvious.[1]

Defendants Jae C. Han, Paula B. Abraham, Barbara Rentzer, Mia Decaro and Young Hwa Yoo (the "Obvious Employees") were employed by Obvious until October 2000 when they left and joined Windstar, a New York clothing manufacturer. (*See* Paik Aff. ¶¶ 5, 8–12; Affidavit of Paula B. Abraham, dated Jan. 11, 2001 ("Abraham Aff.") ¶ 27; Affidavit of Mia Decaro, dated Jan. 12, 2001 ("Decaro Aff.") ¶ 15.) Park is the president of Windstar and a cousin of Gang by marriage. (Tr. at 24; Affidavit of Jong Ki Park, dated Jan. 19, 2001 ("Park.Aff."), ¶ 3.) Defendant Global Apparel, Inc. ("Global") is a California company that manufactures and distributes apparel for Windstar. (Paik Aff. ¶ 6.)

*Underlying Facts*

In 1998, Obvious applied to the U.S. Patent and Trademark Office ("PTO") to register "Girl Zone" as a trademark. (Paik Reply Aff. ¶ 11.) In support of the application, Gang signed a declaration on September 29, 1998 ("PTO Declaration") stating that Obvious had

---

1. No party to this litigation offered certificates showing ownership in Obvious or documentary evidence demonstrating a controlling interest in Obvious.

adopted and is using the ["Girl Zone"] trademark ... for ... girl's and women's clothing. The trademark was first used in [Obvious' apparel] ... on August 1, 1998, and is now used in interstate commerce. The mark is used and displayed in the labels, invoices, advertisements and order forms and three specimens showing the mark as actually used are presented herewith.

(Paik Reply Aff. Ex. C: PTO Declaration). On December 1, 2000, the PTO issued a federal trademark registration certificate to Obvious for "Girl Zone" effective as of July 11, 2000. (Paik Aff. Ex. B: Girl Zone Registration Certificate.)

Plaintiffs assert that soon after Gang left Obvious, Park recruited the Obvious Employees to work for Windstar marketing the "Girl Zone" trademark and at least five designs entitled "Pucker Up Frog," "Huggable Koala," "Chiky," "Lovebug Ladybug" and "Holy Cow" (collectively, "Sleepwear Designs"). (Paik Aff. ¶¶ 44, 49.) According to plaintiffs, Park realized his goal on October 7, 2000, when Kohl's Department Stores ("Kohl's") ordered clothing from Windstar bearing the Sleepwear Designs and the "Girl Zone" trademark. (Paik Aff. ¶ 54.) On October 19, 2000, Windstar sent "cut tickets" to Global specifying the manufacturing measurements for Kohl's order and listing Kohl's as Windstar's buyer. (Paik Aff. ¶ 63, Ex. L: Cut Tickets.)

Sensing that something was wrong in Chere Amie's New York office, Chang Lee traveled from Chere Amie's Los Angeles headquarters to New York to meet with the Obvious Employees. (Tr. at 14; Lee Reply Aff. ¶ 2.) While the parties dispute what occurred at this October 23 meeting in New York, it is clear that the Obvious Employees left Obvious to join the employ of Windstar which was several floors below Obvious offices at 1407 Broadway. (Conf. Tr. at 7.)

On November 3, 2000, Kohl's Corporation ("Kohl's") purchased $8,729.76 worth of Sleepwear Design children's pajamas bearing the "Girl Zone" trademark from Windstar. (See Paik Aff. Ex. J: Purchase Order & Paik Aff. Ex. K: Kohl's Printout.)

By applications dated December 13, 2000, Obvious sought to register the Sleepwear Designs with the U.S. Copyright Office (the "Copyright Office") and identified September 2000, as their completion date. (See Paik Aff. Ex. C: Copyright Certificates.) The Copyright Office issued certificates of copyright registration for the Sleepwear Designs effective that day. (See Paik Aff. Ex. C: Copyright Certificates.)

Between December 6 and 9, 2000, plaintiffs' representatives purchased sleepwear bearing the "Girl Zone" trademark and the Sleepwear Designs at Kohl's stores in Secaucus, New Jersey, Jericho New York, Stow, Ohio, Lone Tree, Colorado, Sterling Heights, Michigan, and Louisville, Kentucky. (Paik Aff. Ex. M (Kohl's Receipts)).

## DISCUSSION

### The Preliminary Injunction Standard

■ "[P]reliminary injunctive relief is an extraordinary remedy and should not be routinely granted." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986). A preliminary injunction may be granted when the moving party can establish: (1) irreparable harm, and (2) either a likelihood of success on the merits or sufficient questions on the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996) (citing *Jackson Dairy v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

█ A demonstration of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983). However, in a trademark and copyright infringement action, a requisite showing of success on the merits generally establishes a risk of irreparable harm. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir.1988) (irreparable harm assumed for trademark infringement); *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 66 (2d Cir.1996) (irreparable harm assumed for copyright infringement). Plaintiffs claim that the defendants' sleepwear infringes upon the "Girl Zone" trademark and the Sleepwear Designs' copyrights. (Compl.¶¶ 75, 80.) Thus, the issuance of a preliminary injunction turns on the plaintiffs' ability to demonstrate a likelihood of success on the merits or a question on the merits and a balance of hardships tipping in their favor.

*Trademark Infringement*

A. *Prima Facie Effect of Registration*

█ Obvious' registration of the "Girl Zone" trademark is prima facie evidence of the trademark's validity, of the registrant's ownership of the mark, and of Obvious' exclusive right to use the mark in commerce "on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115(a); *see also Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir.1999); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986). This statutory presumption shifts the burden of persuasion to defendants. *See Topps Co. v. Gerrit J. Verburg Co.*, No. 96 Civ. 7302(RWS), 1996 WL 719381, at *4 (S.D.N.Y. Dec. 13, 1996) (the party con-

testing validity "must put something more into the scales than the registrant") (citing *Aluminum Fabricating Co. v. Season–All Window Corp.*, 259 F.2d 314, 316 (2d Cir. 1958)).

B. *Use of "Girl Zone" in Commerce*

To register a trademark, a registrant must show that the goods have been sold or transported in commerce. 15 U.S.C. § 1127. Defendants argue that Obvious' "Girl Zone" trademark is void ab initio because it was never used in commerce "before it was registered." (Defs.' Mem. of Law in Opp. to Pls.' Order to Show Cause Seeking a Temporary Restraining Order and Injunctive Relief ("Defs.' Mem. in Opp.") at 10.) To support this contention, Gang testified that Obvious "never put the 'Girl Zone' label in any clothing that it sold" or otherwise advertised the "Girl Zone" trademark during his tenure as president. (Tr. at 45.) However, that testimony contradicts Gang's 1998 PTO Declaration, submitted under threat of criminal penalty,[2] that the "Girl Zone" trademark was used and displayed in "labels, invoices, advertisements and order forms" and his submission of three specimens showing the mark was actually used. (*See* Paik Reply Aff. Ex. C: Declaration to the PTO.) Defendants counter that the inconsistency stems from Gang's good-faith reliance on counsel for the accuracy of his PTO Declaration. (Tr. at 86.) Gang's testimony is not credible. Even if he relied on counsel's definition of the "used in commerce" requirement, Gang's reliance could not have led him to assert under oath that Obvious applied the "Girl Zone" mark to labels, invoices and advertisements if, in fact, it never did. Further, while Gang is not a party to this action, his

**2.** *See* 18 U.S.C. § 1001 (making false statement to government agency punishable by fine and up to five years imprisonment).

bias toward Park, his cousin and the younger brother of his current employer, was apparent at the hearing. (Tr. at 24.) In light of Gang's inconsistent statements and his multiple ties to the defendants, this Court accords little weight to his testimony.

■ Defendants also rely on declarations of Decaro and Abraham stating that plaintiffs never sold or marketed any "Girl Zone" clothing from before the registration of the "Girl Zone" trademark on August 1, 1998 through the time they left Obvious in October 2000. (*See* Abraham Aff. ¶ 24; Decaro Aff. ¶ 8.) Their accounts contrast with Paik's affirmations of Obvious' continuous use of "Girl Zone" since August 1, 1998. (*See* Paik Aff. ¶¶ 48–50; Paik Reply Aff. ¶¶ 11–12.) This Court finds that the defendants' self-serving statements fail to refute the strong presumption of the trademark's validity.[3] *See* 15 U.S.C. § 1057(b) (a certificate of registration is prima facie evidence of validity); *American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 106 (2d Cir.1978) (certificate creates a strong presumption of the validity of the mark); *see also Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 542 (2d Cir.1956) (mere fact of plaintiff's registration creates a strong presumption of validity which defendant must rebut).

### C. *Likelihood of Confusion*

This Court has carefully examined samples of the parties' sleepwear products and compared them side by side. Plaintiffs' samples came from its manufacturing facility, and defendants' samples were purchased by plaintiffs' representatives at various retail outlets across the country. The labels and designs on the parties' sleepwear, are identical, and the quality of the clothing is similar. (See Transcript from Conference dated January 8, 2001 at 5 ("Conf.Tr.") (comparing Pls.' Ex. 1 (Windstar Apparel Pajamas) and Pls.' Ex. 2 (Obvious Pajamas).)) Thus, there is a likelihood of confusion.

### D. *The License of "Girl Zone"*

Defendants assert that Windstar licensed the "Girl Zone" mark from Obvious on February 25, 1999. They rely on a license agreement that purports to authorize the licensee to utilize the "Girl Zone" mark "in its own normal course of business." (Defs.' Mem. in Opp. at 11.; Affidavit of Donald Kim, Esq. dated Jan. 19, 2001 ("Kim Aff.") Ex. A: Licensing Agreement.) This sweeping and vague license was purportedly granted for a total consideration of ten dollars which the licensor never received. (Tr. at 48.) Instead, Gang simply put pocketed the ten dollars and never recorded any payment in Obvious' books and records. (Tr. at 26, 50.) The purported license agreement was executed by Gang on behalf of Obvious and by his cousin Park on behalf of Windstar. (Tr. at 26–27.) At that time, Obvious had already spent $1,000 to register the "Girl Zone" mark. (Tr. at 32.) At the hearing, Gang delivered the coup de grâce to the license defense when he acknowledged that he would not have entered into the transaction if Park was not his cousin. (Tr. at 50.)

■ The confluence of these suspect circumstances and Gang's candid admission cast a spectre of fraud over the license. *See, e.g., Cadle Co. v. Newhouse*, No. 98 Civ. 5945(NRB), 2000 WL 1721131 at *1 (S.D.N.Y. Nov 16, 2000) (the indices of fraudulent conveyance include a familial relationship between the parties and a lack

---

**3.** Presumable for strategic reasons, neither Abraham nor DeCaro sought to testify at the hearing.

of consideration); *see also Apple Bank for Sav. v. Contaratos,* 204 A.D.2d 375, 376, 612 N.Y.S.2d 51, 52 (2d Dep't.1994) (mother's transfer of real property to daughter for ten dollars indicated an intent to defraud creditors). This Court finds that the purported license is a sham. Further, the "clearly inadequate consideration" of ten dollars paid for the license whose registration fees alone cost over $1,000 suggests that this transaction is void under New York law as a waste of Obvious' assets. *See Aronoff v. Albanese,* 85 A.D.2d 3, 5, 446 N.Y.S.2d 368, 370 (2d Dep't 1982) ("If there is a great disparity in the values between the assets expended and the benefits received, the courts will infer that the directors are guilty of improper motives, or at least recklessly indifferent to stockholders' interests.").

Since the license is fraudulent, defendants cannot demonstrate any possibility, let alone a likelihood, of success on the merits of their licensing defense.

E. *Abandonment of the "Girl Zone" Trademark*

Defendants also argue that the plaintiffs' failure "to use the trademark from the time of its creation in late summer or early fall of 1998 through at least October, 2000" together with the license agreement demonstrate that Obvious abandoned the trademark. (Defs.' Mem. in Opp. at 12.) Since this Court has determined that the license is fraudulent, defendants cannot rely on it to support their abandonment defense.

Under 15 U.S.C. § 1127, a mark is abandoned "[w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances." *See L & J.G. Stickley, Inc. v. Canal Dover Furniture Co.,* 79 F.3d 258, 263 (2d Cir.1996). A defense of abandonment must be proven by clear and convincing evidence. *See Pilates, Inc. v.*

*Current Concepts, Inc.,* 120 F.Supp.2d 286, 295 (S.D.N.Y.2000); *see also* McCarthy on Trademarks and Unfair Competition § 17:21 (4th ed.1997).

Without the statutory benefit of prima facie evidence deriving from three years of non-use, *see* 15 U.S.C. § 1127, the defendants must show non-use and no intent to resume use of the trademark in the nearly foreseeable future by clear and convincing evidence. *See Stetson v. Howard D. Wolf & Assocs.,* 955 F.2d 847, 850 (2d Cir.1992). The defendants do not offer evidence or even argue that Obvious lacked the intent to resume use of the "Girl Zone" trademark. Moreover, plaintiffs recent sales of "Girl Zone" clothing, and their filing of this action shortly after defendants made their allegedly infringing sales contradict any notion that plaintiffs intended to abandon the "Girl Zone" mark. Accordingly, this Court finds the abandonment defense to be without merit.

III. *Copyright Infringement*

A. *Prima Facie Effect of Registration*

A prima facie claim of copyright infringement requires a showing that the claimant owns the copyright, and that the defendant has copied a material amount of expression therefrom. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). Plaintiffs have produced five copyright certificates. (*See* Paik Aff. Ex. C.) Under 17 U.S.C. § 410(c), the certificates constitute prima facie evidence of the originality of the work and the facts stated in the certificates. The certificates state that Obvious is the sole author of the Sleepwear Designs, and therefore, the owner of the copyrights. Plaintiff has satisfied the first element of its prima facie case.

The next element of Plaintiff's claim is proving that defendants copied a material

amount of expression from their works. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 69–70 (2d Cir.1999); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998); *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139–140 (2d Cir.1992). Access is uncontested since the former Obvious Employees certainly had access to the Sleepwear Designs during their employment with that company. (*See* Paik Aff. Ex. G: Customer Request Forms (requests for specimens of the Sleepwear Designs dated Sept. 22, 2000 & Sept. 25, 2000).) As for the works themselves, the Court has carefully examined them and concludes using the ordinary observer test, *Nihon Keizai Shimbun,* 166 F.3d at 70, that they are virtually identical. Thus, plaintiffs have established not only copying but they have also met their burden of proving substantial similarity.

B. *Defendants' Rebuttal*

■ Attempting to rebut plaintiff's prima facie case, defendants raise a number of arguments, none of which have any merit. Defendants first argue that the "alleged copying took place before the protection was in place." (Defs.' Mem. in Opp. at 14.) This argument evidences a fundamental misunderstanding of the nature of copyright protection. Copyright exists automatically upon the creation and fixation of an original work of authorship in a tangible medium of expression. *See* 17 U.S.C. 102(a). The Copyright Office does not grant copyrights. Conditioning the existence of copyright protection on the filing of an application with a government agency was abandoned in the 1909 Copyright Act. That Act substituted a system of "self-copyrighting" in which copyright vested upon publishing the work with a proper copyright notice. *See* 1 William F. Patry, Copyright Law & Practice 59 (1994). An innovation of the 1976 Copyright Act was to move to a system of

"automatic copyright" in which copyright vests by the mere act of creation. 1 Patry, *supra,* at 428. This change was made in contemplation of the United States' eventual joining of the Berne Convention for the Protection of Literary and Artistic Works, article 5(2) of which prohibits the "enjoyment and exercise" of copyright being "subject to any formality." The United States joined the Berne Convention effective March 1, 1989. 1 Patry, *supra,* at 453. As a result of that adherence, conditioning of copyright on the formality of registration would violate the United States' treaty obligations. As a result of these obligations, registration merely bestows certain prima facie benefits. 17 U.S.C. § 410(c); *SHL Imaging, Inc. v. Artisan House,* 117 F.Supp.2d 301, 305 (S.D.N.Y.2000.)

Defendants argue further that Obvious procured copyright certificates for the Sleepwear Designs with deliberately false statements in their applications. (Defs.' Mem. in Opp. at 13.) Defendants observe that Obvious "left out the date and the nation in which the designs were first published" in space 3 of the application, and stated in space 5 that no prior registration for the Sleepwear Designs had been made despite knowing that defendants had a pending application for the same work. (Defs.' Mem. in Opp. at 13.)

■ A party seeking to establish fraud on the Copyright Office in order to rebut the presumption of copyright validity, bears the heavy burden of proving deliberate misrepresentation. *See Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d 452, 455 (2d Cir.1989); *see also Eckes v. Card Prices Update,* 736 F.2d 859, 861–62 (2d Cir.1984) (fraud on the Copyright Office occurs only when there is a "knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application"); *Santrayall v. Burrell,*

993 F.Supp. 173, 176 (S.D.N.Y.1998) (the affirmative defense of fraud requires proof of deliberate misrepresentation to overcome the presumption of validity); 2 Patry, *supra*, at 1223–25.

Space 3 of a copyright application requests information concerning the creation of the work, and where applicable, the date and nation of first publication. The Copyright Office's instructions caution, though, that applicants should not "confuse 'creation' with 'publication.' Every application for copyright registration must state 'the year in which creation of the work was completed.' Give the date and nation of first publication only if the work has been published." *See Copyright Office Form VA,* Instructions to Space 3. Information on the date and nation of the first publication of the work is required only if the work has been published, and is used to determine national eligibility, i.e., whether a foreign work is eligible for protection in the United States.

■ Defendants' space 3 argument is difficult to understand, but seems to be based on their mistaken belief that copyright is granted by the Copyright Office. Under defendants' apparent theory, the works in question were published prior to registration and thus the Copyright Office was defrauded by the lack of information about this purported publication. However, since copyright is automatic, the date of any prior publication is irrelevant to the existence of protection. Moreover, even if the works are published, the defendants cannot prove fraud on the Copyright Office since the Copyright Office would not have rejected the application had it known that the works had previously been published. With the abolition of the notice requirement in the 1988 Berne Convention Implementation legislation, the importance of

publication has been effectively reduced to a factor in national eligibility determinations, determinations that are irrelevant to this dispute between domestic corporations and individuals. At most, the Copyright Office would have asked the Plaintiffs to supplement the applications.[4]

■ Defendants' space 5 argument fares no better. Defendants complain that plaintiffs failed to apprise the Copyright Office of defendants' pending applications for the same works. (Defs.' Mem. in Opp. at 13). However, space 5, by its own terms, must be filled out only if an prior registration has been made. Since defendants' application was only pending, plaintiffs were under no obligation to fill out space 5. Moreover, even if the Copyright Office had known of the competing applications, it would not have rejected them because the Copyright Office does not adjudicate competing claims for the same work. *See, Cmty. for Creative Non–Violence v. Reid,* 846 F.2d 1485, 1489 (D.C.Cir.1988), *aff'd,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). Instead, the Office issues certificates to both parties and the question of validity is left to the courts. *See, e.g., Cmty. for Creative Non–Violence,* 490 U.S. at 730, 109 S.Ct. at 2167. Since the Copyright Office would not have rejected the certificate even if it knew of the defendants' applications, the defendants' defense of fraud on the Copyright Office fails.

## CONCLUSION

This Court finds that the plaintiffs Chere Amie, Inc., Obvious, Inc. and Greena, Inc. have shown a likelihood of success on the merits of their claims for trademark and copyright infringement. Accordingly, pending final judgment in this matter, the

4. Accordingly, whether the representations to the Trademark Office on use of the mark on the goods in question in commerce, as well as

the sale of the goods to Kohl's are facts which would support a finding of publication need not be decided in the current motion.

**352**

defendants Windstar Apparel, Corp., Global Apparel, Inc., Jong Ki Park, Jae C. Han, Paula Abraham, Barbara Rentzer, Mia Decaro and Young Hwa Yoo are enjoined from

1. Directly or indirectly using the "Girl Zone" trademark bearing registration no. 2,365,790 or any other similar mark likely to cause confusion, mistake, or deceive;

2. Directly or indirectly infringing on those copyrights bearing the federal registration numbers 477–491, 477–490, 477–492. 477–494, and 477–493.

Defendants are further ordered to

3. Recall from all distributors, wholesalers, jobbers, dealers, and retailers and deliver to Obvious, Inc. any originals, copies, facsimiles, or duplicates of any products employing the "Girl Zone" trademark, registration no. 2,365,790 or with those designs those copyrights are numbered 477–491, 477–490, 477–492. 477–494, and 477–493;

4. Account for and hold in a constructive trust all gains and profits derived from sales of any products employing the "Girl Zone" trademark, registration no. 2,365,790 or those designs those copyrights are numbered 477–491, 477–490, 477–492. 477–494, and 477–493.