PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-2023

_____

CLAYTON PRINCE TANKSLEY,
                                                      Appellant

v.

LEE DANIELS; LEE DANIELS ENTERTAINMENT;
DANNY STRONG; DANNY STRONG PRODUCTIONS;
TWENTY-FIRST CENTURY FOX, INC., Parent Company
of Fox Entertainment Group, Inc., 20th Century Fox Film
Corp, 20th Century Fox Television Inc, 20th Century TV Inc.,
20th Century Fox International, 20th Century Fox
International Television LLC and 20th
Century Fox Home Entertainment LLC; FOX NETWORK
GROUP INC, Parent Company of Fox Broadcasting
Company, Fox Television Stations, Inc.,
Fox Digital Media, Fox International Channels, Inc.; DOES 1
THORUGH 10; SHARON PINKENSON, Executive
Director; GREATER PHILADELPHIA FILM
OFFICE; LEAH DANIELS-BUTLER

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-16-cv-00081)
District Judge:  Honorable Joel H. Slomsky

_____


Argued April 9, 2018

Before:  CHAGARES, VANASKIE and FISHER, *Circuit Judges*.


(Filed: August 28, 2018)


Mary E. Bogan        [ARGUED]
1650 Market Street, Suite 3600
Philadelphia, PA 19103


Predrag Filipovic      [ARGUED]
1735 Market Street
Mellon Bank Center
Philadelphia, PA 19103


*Counsel for Appellant*

Richard L. Stone    [ARGUED]
Andrew J. Thomas
Andrew G. Sullivan
Jenner & Block
633 West 5th Street, Suite 3600
Los Angeles, CA 90071

Michael K. Twersky
Fox Rothschild
2000 Market Street, 20th Floor
Philadelphia, PA 19103

 *Counsel for Lee Daniels, Lee Daniels Entertainment,*
*Danny Strong, Danny Strong Productions, Twenty First*
*Century Fox Inc., Fox Network Group Inc. and*
*Leah Daniels-Butler*


Rigel C. Farr, Esq.
Charles M. Golden, Esq.
Mathieu Shapiro, Esq.  [ARGUED]
Obermayer Rebmann Maxwell & Hippel
1500 Market Street, Suite 3400
Philadelphia, PA 19102

 *Counsel for Sharon Pinkenson and Greater*
*Philadelphia Film Office*

_____


OPINION OF THE COURT

_____

3

FISHER, *Circuit Judge*.

Clayton Prince Tanksley is an actor and producer who lives in Philadelphia. In 2005, he created a three-episode television pilot, *Cream*, for which he received a copyright. In 2015, Fox Television debuted a new series, *Empire*, from award-winning producer and director Lee Daniels. Shortly thereafter, Tanksley filed suit, claiming that *Empire* infringed on his copyright of *Cream*. The District Court found no substantial similarity between the two shows and dismissed Tanksley's complaint. For the reasons stated below, we will affirm.

I

A. Factual Background

In 2005, Tanksley wrote, produced, directed, filmed, starred in, and copyrighted three episodes of *Cream*, a show about an African-American record executive who runs his own hip-hop label. In 2008, Tanksley participated in an event called the Philly Pitch hosted by the Greater Philadelphia Film Office. The Philly Pitch provided an opportunity for aspiring local writers to pitch movie concepts to a panel of entertainment professionals. Lee Daniels served as a panel member.

During his presentation to the panel, Tanksley pitched an idea unrelated to *Cream*. At a meet-and-greet following the pitches, however, Tanksley spoke with Daniels one-on-one, and the two discussed the show. Daniels apparently expressed interest, so Tanksley provided him with a DVD and a script of the series. Tanksley's complaint does not allege any further contact between him and Daniels. In 2015, nearly seven years later, Fox aired the debut episode of the Daniels-created series *Empire*, which also revolves around an African-American

4

record executive who runs his own music label.

The following are brief descriptions of each show.[1]

*Cream*

Winston St. James is the founder and owner of Big Balla Records based in Philadelphia. *Cream* documents the challenges Winston faces as he attempts to run his record label while dealing with a variety of personal and family problems. *Cream* features numerous, prolonged sex scenes and portrays Winston and other characters as highly promiscuous. The show has several story arcs of varying prominence; the main three are outlined below.

Herpes: Throughout the show, Winston has a number of sexual forays with various characters, including his two assistants, Chantal and Tiffany. Towards the end of the first episode, Winston grabs his groin in obvious pain and instructs an assistant to schedule a doctor's appointment for him immediately. Early in the second episode, Winston learns from his doctor that he has herpes. In this scene, the dialogue between Winston and his doctor is conspicuously educational for a drama, and includes many clinical details about herpes prevention and treatment. Episode two concludes with Tanksley (out of character) delivering a lengthy public service announcement about sexually transmitted diseases. In the third episode, the audience learns that Winston's two assistants also have herpes, and there are intra-office recriminations over the source of the outbreak. At the end of the third episode, Winston learns that Chantal's husband has been visiting a prostitute who has herpes, dramatically revealing her as the unexpected source

---

[1] The District Court provided an exceptionally thorough summation of each show, the most relevant portions of which we have attempted to distill here.

5

of the outbreak at Big Balla Records.

Domestic Abuse: Early in the first episode, Winston's younger sister, Angelica, is physically abused by her boyfriend, Shekwan. He is upset over Angelica's failure to get him an audition with Big Balla Records. After discovering the source of Angelica's injuries, Winston agrees to give Shekwan an audition, but also arranges to have him murdered. The first episode ends with two of Winston's associates shooting Shekwan many times from the shadows of an alley. Following the first episode, the actress who plays Angelica delivers a public service announcement about domestic abuse. In the second episode, Shekwan survives the shooting and makes a full—miraculous, even—recovery. Winston then allows Shekwan to make a record, but attempts to sabotage him with a comically bad song. To Winston's chagrin, the song ends up being massively successful, with many suppliers calling Winston's office directly to order several thousand copies.

Company Takeover: Winston's ex-girlfriend, Brenda, and his father, Sammy, are introduced in the final scene of the second episode. The audience learns that Winston's younger brother and sister are actually his and Brenda's children. Winston's parents raised the children because of Brenda's past drug abuse. Sammy—now apparently estranged from his ex-wife and Winston—pledges to help Brenda get her children back and vows to take control of Big Balla Records. Sammy and Brenda then have sex and the episode ends. In the third episode, Winston's mother, Nora, gets in a fight with Brenda and suffers a fatal heart attack. At her funeral, the audience learns for the first time that Nora owned fifty percent of Big Balla Records. Sammy confronts Winston and demands Nora's share of the company, which Winston refuses. Later, Sammy learns that Nora gave her shares to her grandchildren, i.e., Winston's children. Following another sex scene with Brenda,

Sammy schemes to drive a wedge between Winston and his children by revealing the truth about their parentage. In this way, Sammy hopes to gain control of Big Balla Records. After learning that Winston is actually her father, Angelica tells him that she never wants to see him again. The third episode ends with the actress who plays Nora delivering a public service message about the apparent crisis of grandparents raising their grandchildren.

*Empire*

Lucious Lyon is the founder and CEO of Empire Entertainment, a prominent record label based in New York City. Lucious rose from a life of poverty and crime in Philadelphia to become a music and entertainment mogul. The members of Lucious' immediate family also play central roles in the series. As outlined below, *Empire*'s first season is defined by several story arcs.

Succession: Unquestionably, *Empire*'s main storyline concerns the question of who will succeed Lucious as head of Empire Entertainment. In the pilot episode, Lucious is diagnosed with ALS and told that he has only three years to live. Lucius keeps his illness a secret, but the prognosis prompts him to tell his three sons that he will soon choose one of them as his successor. Lucious' decision is complicated by the fact that each of his sons has a unique set of talents and liabilities. His oldest son, Andre, is a Wharton graduate and the current CFO of Empire Entertainment. Andre, however, lacks musical talent, and Lucious, as an acclaimed artist in his own right, believes that Empire should be led by a musician. The middle son, Jamal, is a talented R&B singer and songwriter, but struggles to gain his father's approval because he is gay. Due to a presumed hostility to homosexuality in the African-American community, Lucious is doubtful that Jamal could

successfully lead Empire Entertainment. Lucious' youngest son, Hakeem, is an emerging, charismatic rapper who embodies the hip-hop lifestyle. Lucious initially favors Hakeem because of his star potential, but Hakeem's immaturity and undisciplined behavior force Lucius to reconsider.

Lucious' Past: Before becoming an entertainment mogul, Lucious dealt drugs and committed various other crimes, some violent. In various ways throughout the series, Lucious' past threatens to undermine everything he has built at Empire. In the pilot episode, Lucious' ex-wife, Cookie, is released from prison after serving a seventeen-year sentence. The audience learns that Cookie took the rap for Lucious so he could use proceeds from a drug sale to launch his career and, eventually, Empire Entertainment. Upon her release, Cookie, whom Lucious divorced shortly after her incarceration began, confronts Lucious at Empire headquarters and demands fifty percent of the company. When Lucious resists, Cookie threatens to inform the SEC that Empire Entertainment was started with drug money, a particularly potent threat in light of Empire's upcoming IPO.

Later in the pilot, Lucious' longtime friend Bunkie attempts to blackmail him by threatening to tell police about Lucious' past crimes. Lucious arranges to meet Bunkie by the river at night, and shoots him in the face. The investigation into Bunkie's death, and Lucious' suspected involvement, play out over the course of the series.

## B. Procedural History

Tanksley filed his initial complaint in the Eastern District of Pennsylvania, alleging copyright infringement and several derivative claims. He then amended the complaint one month later. Following a hearing on Defendants' motions to

dismiss, the District Court permitted Tanksley to further amend his complaint.

The operative complaint asserts that *Cream* and *Empire* are "in many respects strikingly substantially similar," Compl. ¶ 39, and contains a detailed analysis—including dozens of screenshots from each show—documenting the alleged similarities. The District Court conducted four days of hearings, during which each party presented video excerpts from the shows to demonstrate similarity or dissimilarity.

The court then granted Defendants' motions to dismiss, finding that Tanksley's complaint fails to state a claim because the two shows are not substantially similar as a matter of law. Tanksley timely appealed.

## II

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367. We have jurisdiction under 28 U.S.C. § 1291. "Our review of the grant of a motion to dismiss is plenary." *Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 877 F.3d 487, 489 n.5 (3d Cir. 2017).

## III

On appeal, Tanksley raises two primary arguments, one procedural and one substantive. Procedurally, he argues that the question of substantial similarity is too fact-intensive to be resolved at the pleading stage. Substantively, Tanksley argues that the District Court erred in finding no substantial similarity between *Cream* and *Empire* as a matter of law.

### A. Copyright Infringement and Rule 12(b)(6)

In order to prove copyright infringement, a plaintiff must establish that his copyrighted work and the infringing work are "substantially similar." *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 561–62 (3d Cir. 2002). This

9

term's meaning will be discussed more fully below. For present purposes, it is enough to observe that substantial similarity "is usually an extremely close question of fact," which is why even "summary judgment has traditionally been disfavored in copyright litigation." *Twentieth Century–Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 n.6 (9th Cir. 1983). Nevertheless, if "no reasonable jury" could find that two works are substantially similar, then "summary judgment for a copyright defendant" has been considered "appropriate." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1296–97 (D.C. Cir. 2002). And in recent years, several Courts of Appeals have taken the next step by affirming dismissals under Federal Rule of Civil Procedure 12(b)(6) after finding no substantial similarity as a matter of law. *See* 3 William F. Patry, *Patry on Copyright* § 9:86.50 (Mar. 2018 update) (citing published opinions from the Second, Seventh, Eighth, Ninth, and Tenth Circuits). Such dismissals, which were formerly rare (but not unprecedented, *e.g.*, *Christianson v. W. Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945)), are now more common.[2]

In justifying dismissals of copyright infringement claims, courts follow a now-familiar logical progression. First, in evaluating a motion to dismiss, courts are not limited to the four corners of the complaint, but may also consider evidence "integral to or explicitly relied upon" therein. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (emphasis omitted) (quoting *In re Burlington Coat Factory*

---

[2] Panels of our Court have affirmed dismissals of copyright infringement claims in two nonprecedential opinions. *Tanikumi v. Walt Disney Co.*, 616 F. App'x 515 (3d Cir. 2015) (per curiam) (nonprecedential); *Winstead v. Jackson*, 509 F. App'x 139 (3d Cir. 2013) (per curiam) (nonprecedential).

*Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). The copyrighted and allegedly infringing works will necessarily be integral to an infringement complaint and are therefore properly considered under Rule 12(b)(6). Next, courts have justified consideration of substantial similarity at the pleading stage by noting that "no discovery or fact-finding is typically necessary, because 'what is required is only a visual comparison of the works.'" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quoting *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766 (2d Cir. 1991)). Finally, having limited the focus to the works themselves, courts will dismiss an infringement action if they conclude that "no trier of fact could rationally determine the two [works] to be substantially similar." 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.10[B][3] (rev. ed. 2018).

The District Court followed this precise line of reasoning in dismissing Tanksley's complaint. First, it properly considered the copyrighted and allegedly infringing works in their entireties. The complaint does not have recordings of either show formally attached as an exhibit, but it includes dozens of side-by-side screenshots of each, so both shows are unquestionably integral to the complaint. Second, the District Court properly concluded that no additional evidence or expert analysis would be relevant to the question of substantial similarity. On appeal, Tanksley criticizes the court for rendering its decision "without the benefit of witness testimony, documentary evidence, or expert analysis," Appellant's Br. 14, but fails to explain how any such evidence could have been relevant. It would not have been. On substantial similarity, the question is how the works "would appear to a layman viewing [them] side by side," *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 908 (3d Cir. 1975),

11

and we have rejected the usefulness of experts in answering this question, *id.* at 907.[3]

In ratifying the District Court's approach, we do not mean to minimize the central role of the jury in cases where substantial similarity might reasonably be found. But where no reasonable juror could find substantial similarity, justice is best served by putting "a swift end to meritless litigation." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980) (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980)). We conclude that the District Court properly considered the question of substantial similarity under Rule 12(b)(6). We next evaluate whether it arrived at the correct answer.

## B. Substantial Similarity

### 1. Background Principles

To establish a claim of copyright infringement, a plaintiff must show: "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002). This second element—unauthorized copying—itself comprises two (frequently conflated) components: actual copying and material appropriation of the copyrighted work. *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 137 (2d

---

[3] We have expressed more openness to expert testimony when the works at issue are highly technical in nature, e.g., computer programs. *Whelan Assocs. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1232–33 (3d Cir. 1986). But television shows, like "novels, plays, and paintings," are precisely the kinds of works for which the ordinary observer test is best suited. *Id.* at 1232.

Cir. 1998); 3 Patry, *supra*, § 9:91. The conceptual distinction between actual copying and material appropriation is foundational to copyright law because not all instances of actual copying give rise to liability, and, conversely, without proof of actual copying the amount of similarity between two works is immaterial. Because we conclude that Tanksley has failed to plausibly allege material appropriation, we do not address the separate question of whether the complaint plausibly alleges actual copying. Nevertheless, a clear understanding of both components is essential to our analysis.

### a. *Actual Copying*

Actual copying focuses on whether the defendant did, in fact, use the copyrighted work in creating his own. If the defendant truly created his work independently, then no infringement has occurred, irrespective of similarity. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 110 (2d Cir. 2001); *see Fred Fisher, Inc. v. Dillingham*, 298 F. 145, 151 (S.D.N.Y. 1924) (L. Hand, J.) (using the example of two mapmakers and noting that "if each be faithful, identity is inevitable," but, "[e]ach being the result of original work, the second will be protected, quite regardless of its lack of novelty"). On the other hand, it is no defense that a defendant copied a protected work—such as a song—subconsciously. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482–84 (9th Cir. 2000) (upholding plaintiff's "twenty-five-years-after-the-fact-subconscious copying claim").

In the great majority of cases, a plaintiff will lack direct evidence of copying, which may instead be shown through circumstantial evidence of access and similarity. 3 Paul Goldstein, *Goldstein on Copyright* § 9:6.1 (Supp. 2008). There is a critical, though often misunderstood, distinction between "substantial similarity" with respect to copying and

13

"substantial similarity" with respect to material appropriation. Two works can be "substantially similar" so as to support an inference of copying, yet not "substantially similar" in the sense that the later work materially appropriates the copyrighted work. *Salkeld*, 511 F.2d at 907. To clearly mark this distinction, we prefer the term "probative similarity" in the copying context, while reserving "substantial similarity" for the question of material appropriation. *See Dam Things from Den.*, 290 F.3d at 562 & nn.19–20. This distinction has critical analytical consequences for what evidence may be considered at each step of the infringement analysis. On the question of copying, the finder of fact may consider any aspect of the works that supports an inference of copying, even elements that are incapable of copyright protection. *See Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 139–40 (2d Cir. 1992); 3 Patry, *supra*, § 9:19. By contrast, when assessing material appropriation, i.e., substantial similarity, only similarities in protectable expression may be considered. *Laureyssens*, 964 F.2d at 139–40. Titles, for example, are quintessentially unprotectable by copyright, but the fact that two works share the same title may be considered as evidence that the later work was copied from the earlier. *Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990).

### b. *Unlawful Appropriation*

Actual copying alone is insufficient to support an infringement claim because a copyright only protects the holder's particular creative expression, not his ideas. At a certain level, copying is perfectly permissible, even expected. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir. 1936) (L. Hand, J.) ("[T]he defendants were entitled to use, not only all that had gone before, but even the plaintiffs' contribution itself, if they drew from it only the more general patterns; that is, if they kept clear of its 'expression.'"). If

copying is proven (or conceded), the defendant is only liable for infringement if his work is substantially similar to the protected elements of the copyrighted work.

In its basic formulation, substantial similarity asks whether "a 'lay-observer' would believe that the copying was of protectible aspects of the copyrighted work." *Dam Things from Den.*, 290 F.3d at 562, or—again quoting Judge Hand—whether "the ordinary observer, unless he set out to detect the disparities [in the two works], would be disposed to overlook them, and regard their aesthetic appeal as the same," *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960), *quoted in Dam Things from Den.*, 290 F.3d at 562. To answer this question, the trier of fact performs a side-by-side comparison of the works and, excluding any unprotectable elements, assesses whether the two works are substantially similar. *Dam Things from Den.*, 290 F.3d at 566.

The difficulty of this analysis derives from the impossibility of drawing an exact line between what constitutes an idea—which is not protected—and an expression—which is. This challenge is particularly acute in the case of dramatic works. As Judge Hand described:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

15

> Nobody has ever been able to fix that boundary,
> and nobody ever can.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (citation omitted). Tanksley's complaint exemplifies these difficulties. His copyright undoubtedly protected more than the literal expression in *Cream*, but it is difficult to draw a principled line to determine at what level of abstraction the expression in *Cream* loses its protection and becomes a mere idea. Is the premise of a television show based on an African-American record executive expression or idea? What about a record executive dealing with family strife? Or dealing with family strife and his relatives' efforts to gain control of his company?

Adding to the difficulty is the need to maintain focus on the protected elements of Tanksley's work, not the prominence of any such elements in the defendant's work. Even if what was taken from *Cream* forms but a minor element in *Empire*, infringement has occurred so long as what was taken was a material part of Tanksley's work. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564–65 (1985) ("A taking may not be excused merely because it is insubstantial with respect to the *infringing* work.").

Seeking to impose a semblance of order on this "at large" analysis, courts have developed several methods and principles for evaluating substantial similarity. In works that involve a mix of protected and unprotected elements, as is the case here, the first step is to identify and exclude from the substantial similarity analysis any unprotected material. In dramatic works, an important category of unprotected content is *scènes à faire*, or plot elements that flow predictably from a general idea. In a film about a college fraternity, for example, "parties, alcohol, co-eds, and wild behavior" would all be

considered *scènes à faire* and not valid determinants of substantial similarity. *Stromback v. New Line Cinema*, 384 F.3d 283, 296 (6th Cir. 2004).

After excising all unprotectable ideas and *scènes à faire*, courts have sought to compare dramatic works across a number of components: plot and sequence of events, dialogue, characters, theme, mood, setting, and pace. *See* Robert C. Osterberg & Eric C. Osterberg, *Substantial Similarity in Copyright Law*, § 4:2–8 (2011). At the same time, however, substantial similarity can be grounded in a work's "total concept and feel," *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995), and courts are admonished not to lose sight of material similarities by "balkanizing a unified copyrighted work into constituent elements, which are then compared in isolation," 3 Patry, *supra*, § 9:73. The total concept and feel approach recognizes that "a work may be copyrightable even though it is entirely a compilation of unprotectable elements," because "[w]hat is protectable . . . is 'the author's original contributions'—the original way in which the author has 'selected, coordinated, and arranged' the elements of his or her work." *Knitwaves*, 71 F.3d at 1003–04 (citation omitted) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350, 358 (1991)). There is obvious tension between the imperative to filter out unprotectable elements of a work while keeping sight of the work's total concept and feel (which necessarily includes unprotectable elements). We reconcile these competing considerations by recalling that the basic inquiry remains whether an ordinary observer would perceive that the defendant has copied protected elements of the plaintiff's work. Other filters, e.g., *scènes à faire*, total concept and feel, etc., while helpful, are merely tools to assist the trier of fact in reaching a proper conclusion.

17

### 2. *Application to* Cream *and* Empire

With these principles in mind, we conclude that, superficial similarities notwithstanding, *Cream* and *Empire* are not substantially similar as a matter of law. This conclusion flows unavoidably from a comparison of the two shows' characters, settings, and storylines.

As a preliminary matter, we note that the shared premise of the shows—an African-American, male record executive—is unprotectable. These characters fit squarely within the class of "prototypes" to which copyright protection has never extended. *Nichols*, 45 F.2d at 122; *see Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003) (observing that only characters with "consistent, widely identifiable traits," e.g., Godzilla, James Bond, and Rocky Balboa, have received copyright protection). The scope of *Cream*'s protection, therefore, extends only to Tanksley's particular expression of this unprotectable idea.

### a. <u>Main Characters and Setting</u>

In *Cream*, Winston St. James runs Big Balla Records, and while he is clearly the man in charge, the label itself is not presented as being particularly glamorous or high profile. Winston appears to run the label largely by himself, his office is small and dated, and aspiring talent audition in what appears to be a dilapidated dance studio that Winston does not even appear to own. In *Empire*, Lucious Lyon's company, Empire Entertainment, is portrayed as a massive corporate conglomerate, with stakes in music, clothing, and entertainment. Lucious' life is portrayed as the epitome of luxury: lavish offices and homes, state-of-the-art studios, and yacht parties.

Lucious is a celebrated artist in his own right, and is portrayed as having an innate ability to recognize talent and get

18

the best out of his performers. Winston, by contrast, does not appear to be a musician of any sort. And while artists in *Cream* crave the opportunity to join his label, Winston is not depicted as having any notable artistic or promotional ability. As for the characters' backgrounds, *Cream* reveals little about Winston aside from the fact that he fathered two children with a drug-addicted woman, with these children being raised under the impression that Winston is their older brother. In contrast, Lucious' background—vividly depicted in flashbacks—forms a central dramatic element in *Empire*. Lucious came up as a drug dealer and used proceeds from drug sales to fund his initial recording venture. *Empire* also reveals that Lucious committed multiple drug-related murders in the past. The possibility that this information will come to light, and the risk it poses to Lucious' fortune and freedom, are central dramatic elements in *Empire*. As these descriptions indicate, even if we assume that Winston and Lucious stem from the same unprotectable idea, the particular expressions of this idea are not substantially similar.

### b. *Main Storylines*

With regard to plot, the similarities between the shows likewise extend no farther than the bare abstraction of an African-American, male record executive. *Cream*'s plot largely, though not exclusively, revolves around Winston's herpes diagnosis. In the first episode, Winston experiences groin pain of unknown origin. In the second episode, he is officially diagnosed with herpes, and it is suggested that one of his paramours has herpes as well. The second episode also concludes with a public service announcement about herpes and other sexually transmitted diseases. In the third episode, multiple additional characters learn that they have herpes, and Winston learns that the husband of one of his inamoratas was the original source of the outbreak. This last piece of

19

information is revealed in *Cream*'s final scene and serves as the show's dénouement. While *Cream* includes several other storylines, the herpes element is the only one woven into all three of its episodes.

The *Empire* plot focuses most concertedly on the question of which Lyon son will be chosen to succeed Lucious as the head of Empire Records. The sons each have a distinct personality and a unique blend of artistic and business savvy, which fuels the dramatic tension over whom Lucious will select. This succession storyline, which dominates *Empire*, has no analog in *Cream*. *Empire* also prominently features Lucious' ex-wife, recently released from prison, who is seeking to gain control of fifty percent of the company and becomes embroiled in the conflict over Lucious' corporate heir.[4]

Tanksley seeks to offset these broad similarities by highlighting particular snippets common to each show. To take a representative example, Tanksley argues that substantial similarity can be found in the fact that Lucious and Winston are both diagnosed with a disease in the course of their

---

[4] It is true that *Cream* contains a secondary storyline wherein Winston's father attempts to wrest control of the company from him. However, in the context of a show about a company, the fact that a storyline would involve who controls that company is neither surprising nor protectable. *Cf. Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (identifying foot chases and morale problems as *scènes à faire* in police dramas). In addition, the expression of this idea in each show is starkly different. Lucious' ex-wife, Cookie, helped him found Empire and has a legitimate claim to her sought-after share of the company. Winston's father is motivated by pure greed.

respective series. The ultimate significance of this comparison is equally representative: any facial plausibility fades upon examination. In *Empire*, Lucious' diagnosis of ALS—which is fatal—creates the urgency to choose his successor, the focal point of the entire series. In *Cream*, Winston's diagnosis of herpes—which is painful—merely serves to interfere with his romantic liaisons and introduces the venereal whodunit that follows. "[R]andom similarities" are insufficient to establish substantial similarity. *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)). After all, both Mozart and Metallica composed in E minor. The question is whether, in view of such similarities, "a 'lay-observer' would believe that the copying was of protectible aspects of the copyrighted work." *Dam Things from Den.*, 290 F.3d at 562.

In considering the protectable elements of *Cream*, we are convinced that "no reasonable jury, properly instructed, could find that the two works are substantially similar." *Gaito*, 602 F.3d at 63 (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983)). As the District Court concluded, even when "viewing the comparisons in the light most favorable to [Tanksley], . . . *Cream* and *Empire* contain dramatically different expressions of plot, characters, theme, mood, setting, dialogue, total concept, and overall feel." *Tanksley v. Daniels*, 259 F. Supp. 3d 271, 294 (E.D. Pa. 2017). Without substantial similarity, Tanksley's complaint fails to state a claim of copyright infringement and was properly dismissed under Rule 12(b)(6).

## C. Derivative Claims

We will also affirm the District Court's dismissal of Tanksley's assorted derivative claims. His claims of contributory copyright infringement are foreclosed by our

21

conclusion that he has not plausibly alleged direct infringement. *See Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 387 (3d Cir. 2017), *cert. denied* 138 S. Ct. 975 (2018). Tanksley's misrepresentation claims against Daniels and his negligence claim against the Greater Philadelphia Film Office, having not been raised in his opening brief, are waived. *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 230 n.17 (3d Cir. 2016). His other negligence claims, being virtually indistinguishable from the infringement claims, are preempted by the Copyright Act. 17 U.S.C. § 301(a); *see Dun & Bradstreet*, 307 F.3d at 217–18. Finally, we will affirm the District Court's determination that further amendment to the complaint would have been futile. *Tanksley*, 259 F. Supp. 3d at 304 n.14.

IV

We will AFFIRM the judgment of the District Court.

22